IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA | * * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-02-2378 |
| MARC J. GOLDBERG, | * | |
| Defendant. | * | |

\* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff the Guardian Life Insurance Company ("Plaintiff" or "Guardian"), as a successor in interest to Berkshire Life Insurance Company ("Berkshire"), has brought this suit against Marc J. Goldberg ("Marc Goldberg," "Marc," or "Defendant") for recission of Defendant's disability income insurance policy and declaratory relief. Currently pending before the Court is Defendant's Motion for Summary Judgment [52]. The Court has reviewed the entire record, as well as the Pleadings, with respect to the instant motion. No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will DENY Defendant's Motion for Summary Judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. In April 2000, Marc Goldberg sought to obtain disability income insurance, using his father, Roger Goldberg as broker. Roger Goldberg was a licensed insurance agent. While Roger Goldberg had a broker's contract with Berkshire, he was not a Berkshire agent or employee.

Both parties agree that Marc Goldberg had a history of neck and back pain, which predated his application for disability insurance. Whether Marc Goldberg disclosed his medical history to

Berkshire in his application, however, remains the subject of dispute.

## The Florida Application

Marc Goldberg alleges that he first submitted an application for disability insurance with Berkshire on April 5, 2000, while visiting his parents in Florida. Marc Goldberg's father, Roger Goldberg, handwrote this application on a Florida application form (the "Florida Application"). In Part 2 of the Florida Application, Marc Goldberg disclosed his neck and back history. The Florida Applications bears both Roger and Marc Goldberg's signatures. Marc Goldberg claims that after completing the form, he gave it to his father, along with a premium check. Marc Goldberg has also stated that Roger Goldberg informed him that he (Roger Goldberg) submitted the application to the Berkshire general agency in Atlanta, Georgia.

At some point, Marc Goldberg alleges, his father told him that the agency lost the Florida Application. Marc Goldberg has testified that three employees of Berkshire, James C. Kilts ("Kilts"), the general agent for Berkshire's general agency in Atlanta in April of 2000, and two of Kilts' former employees, Melanie Husley-Vineyard ("Husley-Vineyard") and Jane Brown ("Brown"), acknowledged that the Company received and lost the Florida Application. The testimony of these three Berkshire employees, however, directly conflicts with that given by Marc Goldberg. Kilts, Hulsey-Vineyard, and Brown all have stated that they have no recollection of any conversation concerning Marc Goldberg's Florida Application. Furthermore, these witnesses claim that they cannot remember *any* customer complaining about a lost application. Berkshire's general agency has no record of the Florida application.

**The Georgia Application**

Although Berkshire never received the Florida Application, Berkshire's records reflect that it did receive an application for disability insurance on behalf of Marc Goldberg on a Georgia form (the "Georgia Application") dated April 27, 2000. The Georgia Application was prepared by Roger Goldberg, and Marc Goldberg has averred that his father submitted the Georgia Application without his knowledge. Marc Goldberg also has stated that he did not sign the Georgia Application, even though the signature on the form appears to be his, and that he first became aware of the existence of the Georgia Application during discovery in this litigation.

The Georgia Application mirrored the Florida Application in most respects. Part 2 of the two forms differed significantly, however. Whereas the Part 2 of the Florida Application disclosed Marc Goldberg's history of neck and back pain, Part 2 of the Georgia Application omitted any reference to Marc Goldberg's treatment for neck and back injuries. In addition, Part 2 of the Georgia Application did not indicate that Marc Goldberg had received psychological or psychiatric care.

Despite the fact that Marc Goldberg claims that he did not know about the Georgia Application, he does concede that he received a fax containing pages from the Georgia Application in May 2000. Berkshire transmitted certain pages of the Georgia Application to Marc Goldberg in an effort to obtain additional information from him. When he received this fax, Marc Goldberg acknowledges that he read over the fax, made a couple of corrections to the information, and sent the revised pages back to Berkshire. Marc Goldberg states that he did not realize that the pages were from a Georgia application for disability insurance rather than a Florida application, but admits that he noticed the faxed application was not the one he originally filled out.

Marc Goldberg also recalls that his father showed him a fax, dated June 15, 2000, concerning

the Georgia Application. Noticing that Marc Goldberg's signature on the Georgia form appeared different than his signature on a paramedical form in Berkshire's possession, Berkshire sent a fax to Roger Goldberg inquiring about the perceived discrepancy. In response to this fax, Marc Goldberg wrote a letter to Berkshire, which stated, "All signatures provided on the Berkshire Long-Term Disability Insurance Application are mine." When asked about this letter and his correspondence with Berkshire in 2000 about the Georgia Application, Marc Goldberg has maintained that he believed that Berkshire's questions referred to the Florida Application.

### The Paramedical Examination

After contacting Marc Goldberg with these questions about the Georgia forms, Berkshire continued to process the Georgia Application. As part of the application for disability insurance, Berkshire required that Marc Goldberg undergo a paramedical examination. Berkshire hired Portamedic of Vienna, Virginia to conduct this examination. On April 29, 2000, paramedical examiner Celeste Grab ("Grab") visited Marc Goldberg's residence in Arlington, Virginia to perform the required examination. Marc Goldberg's wife, Ayelet was also present during the paramedical examination.

All parties agree that initially Grab collected blood and urine samples from Marc. As part of the examination, Grab also had to complete a two-page form that listed nearly twenty questions about the proposed insured's health. The version of this form attached to Marc Goldberg's application for insurance only has check marks in the "No" column, including in response to Question 5(g), which asks whether Goldberg had or was treated for "injury, strain or sprain involving the back." The "No" box is also checked next to Question 5(d), which asks whether Goldberg had or was treated for "anxiety, stress, depression or other mental, emotional or psychiatric

4

disorder." Marc Goldberg admits that this form contains false information, but the parties have vastly different explanations of how these erroneous answers came to appear on this form. Marc Goldberg claims that Grab arrived at this house without an appointment shortly before he had to head to the airport to catch a flight. Because Marc Goldberg had "only a few minutes" for the examination, he testified that it seemed "unlikely" that Grab had time to ask him the twenty or so questions about his health. Marc Goldberg Dep. at 277. When shown the two-page questionnaire, Goldberg replied that Grab had not asked him the questions on the form. Marc Goldberg Dep. at 284. Ayelet Goldberg gave similar testimony and stated in an affidavit that she "d[id] not believe that Ms. Grab asked [her] husband any questions about his health . . . . She [Grab] was in [the] apartment such a short period of time that there would have been no time to ask nearly 20 questions about [Marc Goldberg's] health." Ayelet Goldberg Aff. at 2. Ayelet Goldberg also testified that Grab did not ask her any questions about her husband's health. Ayelet Goldberg Aff. at 2.

Although Marc Goldberg maintains that Grab never asked him the questions on the two-page form, he concedes that he might have signed the form.[1] Marc Goldberg explains that if he did sign the form, he did not know what he had signed, stating:

> I might have, at the time, thought I was signing for the blood and urine sample. I might have thought I was signing to get her out of my house. I don't know.

Marc Goldberg Dep. at 297. He also states that he spoke to Grab to discuss the events of that day and that Grab stated that she had filled in the answers on the questionnaire.

Grab's testimony, however, conflicts with that given by Marc and Ayelet Goldberg. At her

---

[1] By signing the form, the signatory attests and acknowledges the statements made in the form are his or her own and are complete and true to the best of his knowledge.

deposition, Grab did not specifically recall conducting Marc Goldberg's paramedical examination, but stated that she would not have signed the two-page form as a witness unless he reviewed the form and signed it. Viewing her signature on the form, Grab stated, "I'm attesting that he signed this, that he looked at this . . . . He answered no to all these questions."

### The Virginia Form

At some point, while Berkshire was processing the Georgia Application, an employee at Berkshire, Jane Brown, discovered that Marc Goldberg should have completed a Virginia application form for insurance because, at the time, Marc Goldberg lived in Arlington, Virginia. Brown then attempted to transfer the information from Marc Goldberg's Georgia Application onto a Virginia application form (the "Virginia Application"). Because Berkshire had the Georgia Application, it continued to underwrite the case, and Berkshire determined that it would obtain Marc Goldberg's signature on the Virginia Application on delivery of the policy.

Brown testified that Berkshire must have informed Roger Goldberg about the Virginia Application and that Roger Goldberg must have known that Berkshire completed the Virginia Application after reading the instructions on the policy placement sheet, dated July 20, 2000, delivered to him with Marc's disability policy (the "Policy"). In particular, these instructions directed Roger Goldberg to return the following documents to Berkshire: a "[s]igned and [d]ated page 4 and 5 of Part I VA Application"; a "[s]igned and [d]ated VA Consent Form"; and a "[s]igned and [d]ated VA Financial Supplement." Pl. Ex. 31.

Roger Goldberg forwarded these documents to his son along with a letter, advising Marc to speak with him before signing and returning the documents to Berkshire. Marc Goldberg Dep. at 385-86. Marc has testified that he followed his father's advice and looked over the policy

6

amendments, but that he did not look at the application attached to the policy. Marc Goldberg has also stated that he did not notice that the application attached to the policy was not the one he initially completed, the Florida Application.

Although Roger Goldberg's letter requested that Marc sign the necessary documents, Marc did not immediately return the requested pages of the Virginia Application. Concerned that Berkshire had not received Marc's signature pages, Melanie Hulsey-Vineyard sent a fax to Marc Goldberg, on August 28, 2000, aptly titled "Re: VA application." This fax asked Marc Goldberg to complete and return the pages that required his signature. Responding to Berkshire's fax, Marc Goldberg signed the Virginia Application on September 25, 2000. At his deposition, Marc Goldberg stated that he retained a copy of this fax in his personal files, but never noticed the "VA" in the title of the fax. He also averred that while he recalled reading the attached application pages before he signed them, he did not notice the "VA" in the lower-left hand corner of these pages.

### Marc Goldberg's Claim for Benefits

In June 2001, Marc Goldberg submitted a claim for benefits under the Berkshire policy. In his claim, Marc Goldberg stated that he had become disabled as of April 20, 2001 due to anxiety and bi-polar disorder. Berkshire initially paid the claim under a reservation of rights, but continued to conduct an investigation of the claim. In June 2002, Berkshire terminated Marc Goldberg's disability payments, alleging that he had made material misrepresentations as to his medical history and condition in his application for disability insurance. When Berkshire terminated his payments, Marc Goldberg already had received payments under the policy totaling $46,900. Amend. Compl. ¶ 27.

Guardian filed suit, as successor in interest to Berkshire, on July 16, 2002 in this Court. The

Amended Complaint seeks declaratory relief and recission of the Policy. At the close of discovery, Marc Goldberg filed the instant motion for summary judgment, on May 31, 2005. This motion is ripe and ready for the Court's disposition, and the Court now will rule on this motion.

## **STANDARD OF REVIEW**

Summary judgment is only appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). In a motion for summary judgment, the moving party discharges its burden by showing an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal citations omitted). To defeat a motion for summary judgment, the non-moving party must come forward and show that a genuine issue of material fact exists. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## **DISCUSSION**

Defendant has moved for summary judgment, contending that Plaintiff cannot prove material misrepresentation under Virginia law.

This Court agrees with Defendant that Virginia substantive law applies to this claim.[2] The Virginia legislature has enacted a statute specifically relating to insurance policies and contracts. Section 38.2-309 of the Virginia Code provides in relevant part:

> All statements, declarations and descriptions in any application for an insurance policy or for the reinstatement of an insurance policy shall be deemed representations and not warranties. No statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue.

Va. Code Ann. § 38.2-309 (2005). Because the Policy had only the Virginia Application and the paramedic examination report attached, Defendant posits that this provision renders it impossible for Plaintiff to prove that he made a material misrepresentation. This Court cannot agree with this reasoning.

Defendant makes several arguments as to why this Court should find that he did not make material representations on the Virginia Application. Pointing to the fact that Jane Brown drafted the Virginia Application, Defendant claims that he had no knowledge of the application and therefore could not have made any representations in the Virginia Application. In addition, Defendant urges this Court to disregard the paramedic examination report because he has testified that he did not answer the paramedic health questionnaire.

First, Defendant claims that technically he did not consent or enter into a contract with

---

[2] A federal court sitting in diversity will apply the substantive law of the state in which it sits. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). Maryland law follows the rule of *lex locus contractu*, which requires a court to apply the law of the state in which the contract was made. *Ward v. Nationwide Mut. Auto. Ins. Co.,* 614 A.2d 85, 88 (Md. 1992); *see also CTI/DC, Inc. v. Selective Ins. Co. of America,* 392 F.3d 114, 118 (4th Cir. 2004).

Berkshire. Specifically, he relies on the following provision of the Virginia Code:

> No contract of insurance upon a person shall be made or effectuated unless at the time of the making of the contract the individual insured, being of lawful age and competent to contract for the insurance contract (i) applies for insurance, or (ii) consents in writing to the insurance contract.

VA Code Ann. § 38.2-302(A). Using syllogistic reasoning, Defendant argues that this provision combined with Section 38.2-309 militates in favor of granting summary judgment. In particular, Defendant asserts that he did not consent to the Virginia Application, and since he did not consent to the Virginia Application, the attachments to the policy do not contain false representations made by him. Therefore, Defendant argues, Section 38.2-309 prevents this Court from considering the Virginia Application. Following this argument to its logical end, however, leads to two possible conclusions: either Marc Goldberg did not have any insurance contract with Berkshire or, if a contract does exist, Marc Goldberg accepted Berkshire's counteroffer, the Virginia Application. *See, e.g.*, *Dickerson v. Conklin,* 235 S.E.2d 450, 455 (Va. 1977) (noting that insurance contracts must be based on mutual assent); *see also Princess Cruises, Inc. v. General Elec. Co.,* 143 F.3d 828, 834 (4th Cir. 1998) (noting that Virginia follows common law rule that an acceptance that varies the terms of the offer is a counteroffer which rejects the original offer); *Chang v. First Colonial Savs. Bank,* 410 S.E.2d 928, 931 (Va. 1991) (holding that an acceptance must mirror the offer for a contract to form). Neither of these theories supports Defendant's position that he has a legal right to the over $46,000 Plaintiff has paid him pursuant to this "non-existent" policy. This problem with Defendant's argument only underscores that granting summary judgment for Defendant at this stage would be inappropriate.

Moreover, based on the record, a fact-finder could determine that Marc Goldberg knew of

and ratified the Virginia Application. Marc Goldberg received the Virginia Application from his father in July of 2000. Berkshire requested that Roger get Marc to sign several the pages of the Virginia Application designated "Part I VA Application," "VA Consent Form," and "VA Financial Supplement." A reasonable juror could infer that based on this communication, Roger Goldberg knew about the existence of the Virginia Application. Virginia law generally considers an insurance broker as an agent of the insured, not of the insurance company. *See, e.g.*, *Commercial Union Ins. Co. v. Charleston Marine Leasing Co.,* 843 F. Supp. 124, 132 n.5 (E.D. Va. 1994) (holding that one who solicits insurance on behalf of the insured is an agent of the insured); *In re Jones*, 19 B.R. 293, 295 (Bankr. E.D. Va. 1982) (stating that a "broker is an agent of the insured, not of the insurance company"); *cf. Pacific Fire Ins. Co. v. Bowers,* 175 S.E. 763, 765 (Va. 1934) (ruling that whether insurance agent acted as an agent for insured or company was a question of fact). As a result, Roger Goldberg's knowledge may be imputed to Marc unless: (1) Roger's behavior raises a presumption that he would not report the information to Marc, or (2) Roger acted out of a personal motive or interest, adverse to Marc's interests. *See Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 594-95 (Va. 1984); *Fulwiler v. Peters,* 20 S.E.2d 500, 502 (Va. 1942).

In his reply, Defendant challenges this argument, stating that he has presented evidence that, in fact, Roger Goldberg did not know about the Virginia Application. Defendant has supplied a September 2001 letter, in which Roger claims that he did not know that Berkshire used a Virginia form to process Marc's application for disability insurance. These assertions are unsworn statements and inadmissible for summary judgment purposes.[3]  *See* Fed. R. Civ. P. 56(e) (providing

---

[3] Unfortunately, Roger Goldberg has passed away and cannot attest to the veracity of these statements.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."); *see also Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir. 1998) (explaining that unsworn statement of employees could not be considered on motion for summary judgment); *Turner v. Human Genome Science, Inc.,* 292 F. Supp. 2d 738, 743 (D. Md. 2003) (refusing to consider unsworn statements as proof in a motion for summary judgment); *Metropolitan Life Ins. Co. v. Hall,* 9 F. Supp. 2d 560, 561 (D. Md. 1998) (explaining that "[u]nsworn pleadings do not satisfy Rule 56(e)'s requirements for summary judgment proof"). Rule 56 of the Federal Rules of Civil Procedure requires that a document "be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). . . ." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2722 (3d. 1998); *see also Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment"). Furthermore, a fact-finder could determine that it defies credulity to suggest that Roger Goldberg, a licensed insurance agent, did not read the policy or realize that Berkshire had issued a Virginia policy. Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has shown a genuine issue of material fact exists as to whether Roger Goldberg had knowledge of the Virginia Application and if this knowledge may be imputed to Marc Goldberg.

Even assuming that Roger Goldberg did not know about the Virginia Application, other evidence indicates that Marc Goldberg independently knew about this application. Defendant does not dispute that he "looked over" the policy amendments, which included the Virginia Application. Nor does Defendant dispute the fact that he signed several pages of the Virginia Application with

12

"VA" printed on the pages. Marc Goldberg also admits that he has retained a copy of the August 28, 2000 fax from Berkshire with the subject line "Re: VA application." Marc Goldberg had several opportunities to review the policy and the Virginia Application, such that a jury could decide that, despite his contentions to the contrary, he knew of the Virginia Application.

This conclusion also comports with the rule set forth in *Gilley v. Union Life Insurance Company,* 76 S.E.2d 165 (Va. 1953) and *New York Life Insurance Company v. Eicher,* 93 S.E.2d 269 (Va. 1956). Although Virginia law generally charges an applicant who signs a document with knowledge of its contents, these cases hold that an insurer in an action on an insurance policy cannot avoid liability because of false representations on the application if: "(1) the false answers contained in the application were inserted by an agent of the insurer, and (2) the answers to the interrogations contained in the application were truthfully given without fraud or collusion, and (3) the applicant had no knowledge, actual or constructive, that his application contained false answers." *New York Life*, 93 S.E.2d at 273; *see also Gilley*, 76 S.E.2d at 170. In *New York Life*, the Virginia Supreme Court reiterated, however, that "if the applicant is a party to the fraud of or in collusion with the insurers agent *or* has actual or constructive knowledge that his application contains false answers material to the risk, neither he nor the beneficiary under the policy will be allowed to profit thereby and the insurer will not be estopped by the knowledge or conduct of its agent from asserting the falsity of such answers as a bar to its liability on the policy." *New York Life,* 93 S.E.2d at 273 (emphasis added). Although Defendant argues that he had no knowledge, actual or constructive, that the Virginia Application existed, several pieces of evidence appear to contradict this claim. In particular, Plaintiff's own admission that he "looked over" the policy refutes his contention that he had no knowledge of the Virginia Application or its contents. This case turns on the credibility of

Marc Goldberg's rendition of the facts. Where, as here, the assessment of credibility remains a disputed issue of fact, summary judgment is inappropriate. *Rainey v. Conerly,* 973 F.2d 321, 324 (4th Cir. 1992) ("[t]he determination of what actually happened depends exclusively on an assessment of the credibility of the respective witnesses [,][t]his assessment is a disputed issue of fact and, therefore, cannot be resolved on summary judgment"); *see also Solis v. Prince George's County*, 153 F. Supp. 2d 793, 801 (D. Md. 2001). Because a reasonable fact-finder could decide that Marc Goldberg ratified the Virginia Application, this Court must deny his motion for summary judgment.

Plaintiff also argues that even if Marc Goldberg did not ratify the Virginia Application, it can still prove that he made a material misrepresentation in the attachments to the Policy because he signed the paramedical examination health questionnaire form. Although Marc Goldberg has given equivocal testimony regarding whether he signed the questionnaire form, taking the evidence in the light most favorable to the non-movant, the Court will assume that the form bears his signature. Defendant again relies on *Gilley* and *New York Life* in support of his claim that Plaintiff may not use the paramedical questionnaire as evidence of a material misrepresentation. Three witnesses, Marc Goldberg, Ayelet Goldberg, and Celeste Grab, have testified about the April 29, 2000 paramedical examination. Marc Goldberg has stated that it was "unlikely" that Grab asked him the questions on the health questionnaire, as he had little time for the paramedical examination. Later, he stated that Grab did not ask him those questions. Ayelet Goldberg also emphasized that because of the short amount of time Grab had to conduct the examination, she"d[id] not believe that Ms. Grab asked [her] husband any questions about his health." Grab, on the other hand, stated at her deposition that she did not specifically recall examining Marc Goldberg, but that she would not have signed the

14

questionnaire form had she not asked him those questions.[4]  Defendant claims Grab's "negative" testimony cannot overcome the "positive" testimony given by him and his wife.

This Court finds Defendant's distinction between positive and negative testimony untenable. The facts of the case at bar differ from those in *Virginia Auto Mutual Insurance Company v. Brillhart*, 46 S.E.2d 377 (Va. 1948), upon which Defendant relies.  In *Virginia Auto Mutual Insurance Company*, one witness testified that she did not recall if a particular conversation occurred.  Two other witnesses testified that the conversation did take place.  Resolving this apparently conflicting testimony, the Virginia Supreme Court held that because the first witness remained unsure as to whether the conversation took place, her testimony could not overcome the positive testimony of the two other witnesses. *Id.* at 382.  The *Virginia Auto Mutual* court also noted that other evidence demonstrated that the first witness heard the conversation at issue.  *Id.*  In this case, only Marc Goldberg has given what a court may construe as positive testimony.  Yet, this Court cannot say as a matter of law that even his testimony constitutes "positive" testimony. Defendant first stated that it was "unlikely" that Grab asked him these questions, but admitted that he may have signed the form.  Then, Defendant stated that Grab may have told him anything to have him sign the form.  These statements do not show that this witness had a specific recollection of the events of that day.  Under these circumstances, a jury could determine that Goldberg supplied the answers on the health questionnaire.

In addition, Plaintiff's wife, Ayelet Goldberg did not specifically recall what Grab said to Marc Goldberg, but testified in her affidavit that she "d[id] not *believe* that Ms. Grab asked [her] husband any questions about his health . . . .  She was in [the] apartment such a short period of time

---

[4] Grab did not foreclose the possibility that her memory could be refreshed.

that *there would have been no time* to ask nearly 20 questions about [her] husband's health." (Emphasis added). Ayelet Goldberg does not recount the details of the conversation between Grab and Marc Goldberg, but rather concludes that Grab had no time to ask questions. Conclusory statements cannot serve as the basis for a motion for summary judgment. *See Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir. 1990). Consequently, this Court finds that Ayelet Goldberg's testimony does not qualify as positive testimony.

While Defendant has asserted that Berkshire's agent wrote in the answers to the questions, it remains very much in dispute whether Defendant provided Grab with this information.[5] The resolution of this issue, once again, turns on Marc Goldberg's credibility. As the evidence may lead a reasonable fact-finder to conclude that Marc Goldberg did provide false answers to Grab, this Court will not resolve this dispute on a motion for summary judgment.

## CONCLUSION

For the aforementioned reasons, this Court will DENY Defendant's Motion for Summary Judgment. An Order consistent with this Opinion will follow.

Date:  November 16, 2005                              /s/
                                              Alexander Williams, Jr.
                                              United States District Judge

---

[5] Defendant also argues that Grab's testimony as to her practice would not be admissible under the Federal Rules of Evidence Rule 406. As this Court is deciding this case without assuming the admissibility of Grab's testimony as to her habits, this Court will not address Defendant's Rule 406 argument.